**Brenda SHERPELL, Plaintiff,**

v.

**HUMNOKE SCHOOL DISTRICT NO. 5 OF LONOKE COUNTY, Defendant.**

**No. LR-C-85-431.**

United States District Court, E.D. Arkansas, W.D.

Oct. 17, 1990.

John W. Walker, Little Rock, Ark., for plaintiff.

Allen C. Dobson, Cross & Gunter, P.A., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

EISELE, Chief Judge.

The Court, at the commencement of the trial on September 17, 1990, noted that it had very serious reservations about going forward with the hearing on plaintiff's retaliation claims because those claims appeared to be barred as a matter of law. Nevertheless, it chose to proceed with the hearing because of its uncertainty as to the meaning and effect of the remand opinion of the Eighth Circuit Court of Appeals. 874 F.2d 536. In so doing, it specifically reserved its rulings on the defendant's Motions to Dismiss and for Summary Judgment until the conclusion of the hearing.

I. BACKGROUND AND DISCUSSION OF EIGHTH CIRCUIT'S HANDLING OF RETALIATION CLAIM.

It appears that the retaliation claim of Ms. Sherpell is back before this Court because the Eighth Circuit Court of Appeals made an error with regard to the record in

this case. Note the following language from that court's opinion of May 9, 1989:

Specifically, appellant (sic) contends that the district court's ruling before the trial that, since appellant did not specifically plead retaliation in her complaint even though she attached the "Right to Sue" retaliation letter to her complaint, she should be denied the opportunity to correct the omission because it was beyond the 90–day limitation period in which to bring suit contained in Title VII. Appellee argues that the retaliation issue is separate and distinct from the issue of racial discrimination and that appellee was never put "on notice" of the retaliation issue in a formal pleading. Appellee further argues that appellant had ample opportunity to amend her complaint to include her retaliation claim.

It appears that the Judges on the panel did not check the record in this case. No "right to sue" letter for retaliation or race is referred to in the complaint or attached thereto. The original complaint was filed on June 11, 1985. It is true that the plaintiff had received her "right to sue" letter on the retaliation claim (EEOC Claim No. 085–85–0103) several months before she filed the original complaint.[1] But she did not mention retaliation in the complaint, plead therein any facts which would suggest such a theory, or attach the retaliation "right to sue" letter thereto. Furthermore, when she filed her amended complaint on August 9, 1985, the purpose thereof was to support her Title VII *race discrimination* claim by attaching a copy of the "right to sue" letter issued in connection with her charge of racial discrimination in EEOC Claim No. 085–85–102. Note the language of paragraph 10 of the "Amended Complaint":

Plaintiff filed a timely Charge of Discrimination with the EEOC, No. 085–85–0102, on October 29, 1985, and received Notice of Right to Sue on July 24, 1985.

Copy of Notice of Right to Sue is attached as Pl.Ex. 2 (Pl.Ex. 1 is attached to the original· Complaint).

"Pl.Ex. 1" was *not* an EEOC "right to sue" letter; it was the leave of absence agreement between the plaintiff and the defendant which is referred to in paragraph 4 of both the original and the amended complaint. (The statement in paragraph 10 that the charge in claim No. 0102 was filed on October 29, 1985, is obviously wrong. The claim was filed on October 29, 1984.) Plaintiff did, indeed, attach to the Amended Complaint her "right to sue" letter with respect to her race discrimination claim No. 102, which she had received on July 24, 1985.

No reference to any retaliation claim is found in any of the plaintiff's formal pleadings prior to the remand of the case from the Eighth Circuit Court of Appeals in 1990. The issue first surfaced in the litigation when it was mentioned in a pretrial brief or pretrial information sheet filed about a week before the trial commenced on September 8, 1987. Note the following colloquy on that date between court and counsel:

MR. SMITH: The plaintiff herein filed an Equal Employment Opportunity charge in April—I believe April of 1984, protesting the failure of the district to select her for employment at that time. She was subsequently issued a right to sue notice on that EEOC charge, the last three digits of which are 002, I believe. And the Right to Sue—I'm sorry, Your Honor. The EEOC charge, the last three digits are 102, was filed on October 24, of 1984.

A right to sue letter issued from the EEOC on that charge on July 19, 1985. And as I recall, it was issued because they had not taken action within the prescribed time limit. There was no finding whether there was a merit to the charge or not.

---

1. The last paragraph of said "Notice of Right to Sue," dated April 19, 1985, states:

The issuance of this NOTICE OF RIGHT TO SUE terminates the Commission's processing of your charge. If you want to pursue your charge further, you have the right to sue the respondent(s) named in your charge in United States District Court. IF YOU DECIDE TO SUE, YOU MUST DO SO WITHIN 90 DAYS FROM THE RECEIPT OF THIS NOTICE OF RIGHT TO SUE: OTHERWISE YOUR RIGHT TO SUE IS LOST.

THE COURT: Well, what happened, this lawsuit was filed on July 11, 1985.

MR. SMITH: This suit was filed before they got the right to sue charge.

THE COURT: And, so, on July 19, 1985 you say the right to sue letter was issued and an amendment was filed which did nothing except change—except to note that the right to sue letter had been obtained. Here it is. It was filed August 9, 1985 and—

MR. SMITH: We did not object to that, Your Honor.

THE COURT: I know it. And, so, Paragraph 10 is the only change I see in that complaint from the first complaint and it says: "Plaintiff filed a timely charge of discrimination with EEOC, No. 085–85–0102, on October 29, 1985 and received notice of right to sue on July 24, 1985. Copy of the right to sue is attached as Plaintiff's Exhibit 2."

It says here: "Plaintiff's Exhibit 1 is attached to the original complaint." But the Plaintiff's Exhibit 1, which is that leave agreement, is not attached to the one in the file. I have yet to see a copy of that.

MR. SMITH: Your Honor, we don't challenge that allegation or the amended complaint, which incorporates the right to sue letter issued after the filing of the complaint.

THE COURT: I understand.

MR. SMITH: We do challenge, however, any attempt in this trial to litigate issues asserted in the EEOC charge, the last three digits of which are 103, which alleges retaliation against Mrs. Sherpell for having filed a previous charge and perhaps filed a previous lawsuit.

THE COURT: Now, when was that?

MR. SMITH: That was filed on October 29, 1984, Your Honor. I guess approximately five days after the first one. The right to sue letter on that charge was issued on April 19, 1985 and—

THE COURT: Give it to me again.

MR. SMITH: Yes, sir. The charge, ending in the number 103, was filed on or about October 29, 1984. The right to sue letter on that charge was issued April 19,

1985. No effort has been made in this litigation until we got the pretrial brief last week to refer to the allegations in charge 103.

THE COURT: I think that's correct.

MR. SMITH: And the right to sue, obviously 90 days, within which they have to bring suit on that charge has long since expired. So we contend that the Court is limited to the allegations contained in the charge ending in the numbers 102, which was filed on October 24, 1984.

THE COURT: Well, it is true the complaint—neither the complaint nor the amended complaint mentions retaliation or mentions that right to sue letter or the EEOC charge, although it was, in fact, filed in October, you say, of 1984 and the letter was received April 19, 1985, which was prior to the date the complaint was filed in this case, June 11, 1985. So it does not—the complaint does not raise an issue of retaliation and you're suggesting that it should not, in any event, be on the EEOC claim since the right to sue letter was issued and the 90 day period to make such a claim has expired.

During that pretrial discussion, the defendant's attorney also raised issues relating to plaintiff's claim under 42 U.S.C. § 1983. Just before the trial, the defendant, Mr. Edsel Weaver, superintendent for the district, settled with the plaintiff and was dismissed from the case, leaving only the Humnoke School District # 5 of Lonoke County as the defendant. Note the following discussion:

MR. SMITH: The final matter, Your Honor, and I know I've taken too long. But one final matter is that the counsel for the superintendent, Mr. Weaver, has entered in—apparently entered into an agreement which I have not seen.

THE COURT: I read it to you. Well, I don't know. There may be an agreement I don't know about.

MR. SMITH: And I do not know the terms of the agreement but the members of the school board are not parties to the agreement and we think that may well have significance because, as the Court knows, under 42 USC 1983, the Board of

Education is not liable under the concept of respondeat superior for acts of its employees.

THE COURT: That's under 1983.

MR. SMITH: That is correct, Your Honor. And we contend the same principle would apply in Title VII.

THE COURT: Well, I have a little problem with it and particularly the way I read it there, as it was handed to me a few minutes ago, in which it states that: "With respect to the claim against him individually"—and then it goes on to say—I don't have it in front of me—"and in his capacity"—Here, it's being handed to me. Quote: "And in his official capacity as superintendent of Humnoke School District No. 5, that the complaint against him separately has been compromised and settled."

Disregarding 1983 principles, generally, the fact that a party may settle with an agent who acts for a principal will not automatically discharge the principal from liability. Just take almost any case you can think of. But this—

MR. SMITH: We would not disagree with that, Your Honor, but under 1983 principles and, we submit, also Title VII, respondeat superior does not apply. In order to recover in this case, they have to prove individual acts of intentional discrimination by members of the board of education of this school district and they cannot suggest the latter liability by proving that Mr. Weaver did or did not do anything.

THE COURT: Well, the—

MR. SMITH: That's a matter that we wanted to alert the Court to and obviously we're not asking for a ruling at this time.

THE COURT: Let me discuss that with you a moment.

Ordinarily, if a person is fired or some action is taken against an existing employee by the school district, by the superintendent or principals and so forth, the matter ultimately percolates up and becomes a matter of concern and action by the school board; all right? But tell me now, at least so I'll know the defen-

dant's position on this, when hiring essentially is the issue or—you know, let's take a case.

Let's say a you have a Simon pure school board who wants to do the right thing. It has an affirmative action program. It is insisting upon fair, even-handed handling of all employment decisions and they have some superintendent who, however, has his own agenda and he proceeds to discriminate against blacks who are applying for work.

Now then, of course, once they learn of it and become privy to it and maybe don't do anything about it, that's something else. But I gather it's your position that at least until that time they would not be responsible for decisions that he might make that they did not approve of or, in fact, that they might have affirmatively instructed him not to do; is that correct?

MR. SMITH: Your Honor, our position would be, in that case that you are postulating, the only way they could establish liability on the part of the school board itself was to show knowledge and some sort of ratification of his conduct—

THE COURT: Acquiescence or something.

MR. SMITH:—or that what he did was pursuant to an official policy of the school board. We contend neither is going to be shown in this case and this case is an application for employment, which is different from a discharge case which requires action by the board of education, obviously.

THE COURT: So even in employment cases where people apply and, say, two or three people apply and a white retired and other people—and finally a lawsuit is filed—you're saying that until the issue becomes known to the school board in such a way as they can be charged for some personal responsibility that they cannot be held liable?

MR. SMITH: The superintendent is liable, Your Honor.

THE COURT: The superintendent is liable and, of course, they've settled with the superintendent here. So that takes him out of it.

The court also discussed the failure to allege the retaliation claim with counsel for the plaintiff during the pretrial discussion on September 8, 1987. Note the following:

MR. PALNICK: I'd like to clear up the EEOC charge question first, because I think that's probably the easiest to start with. The plaintiff filed her EEOC charge No. 102 on the 24th as Mr. Smith indicated.

THE COURT: The 24th of what? Repeat that now.

MR. PALNICK: The 24th of October, 1984. I think the dates that Mr. Smith indicated are correct, Your Honor. It is our position that the retaliation claim was filed on October 29th, that plaintiff also received the right to sue for such on April 19, 1985 and that within 90 days of that receipt of the right to sue on June—I believe it's July 19th this action was filed.

THE COURT: June 11th, I think.

MR. PALNICK: June 11th. I'm sorry, Your Honor.

THE COURT: Look at the first page, please.

MR. PALNICK: June 11, 1985 plaintiff brought an action in this court seeking relief as stated in the complaint under 42 USC 2000(e) et seq. Encompassed within 42 USC 2000(e) et seq. is Section 3(e), I believe, which is retaliation. And, as such plaintiff's complaint encompasses that first right to sue as well. Then—

THE COURT: Well, let me ask you. First of all, you did not have the right to sue letters at the time the complaint was filed?

MR. PALNICK: We did have the first right to sue—

THE COURT: Yes, you did have this one. I see. So it wasn't used then and then when you did ask to amend it you mentioned the 102, but not 103?

MR. PALNICK: That's correct, Your Honor.

THE COURT: And there's nothing also in the narrative part of the complaint which suggests retaliation claim. Although, in fact, I guess you were in the middle of that lawsuit at the time.

MR. PALNICK: That's correct, Your Honor.

THE COURT: I'm having trouble with the 90 day requirement. I don't know if you can just, say, look at the statute, which permits an action for retaliation, when you have not followed the administrative procedures with respect to that particular charge—It's clear the charges are different and the statute contemplates that they are different.—as an independent basis for relief.

MR. PALNICK: Your Honor, if I might. At the time the complaint was filed there was only one right to sue issue, and so at that point plaintiff only had met the jurisdictional prerequisites for her lawsuit under 2000(e) under that particular right to sue.

Secondly, plaintiff knows of no requirements by the—by rulings of the court or by statute which requires that the plaintiff attach her right to sue or make reference to the actual EEOC charge in the filing of her complaint.

THE COURT: Well, you're not saying that when you file your lawsuit there should not be some indication in it that you are relying upon a basis—I mean, when the statute said you will file your lawsuit within 90 days—I mean, you can't file an automobile personal injury case and say that told [sic] it, somehow or another, that you met the requirement. Now, here you made very specific allegations concerning the leave of absence agreement, the failure to employ her in accordance with the agreement, the failure to hire her in response to applications made by her.

MR. PALNICK: That's correct, Your Honor, and we consider that to be retaliatory conduct under which the right—the EEOC charge was filed and the right to sue was issued. And that's why the Complaint was filed under 2000(e). Otherwise, there would have been no proper allegation under 2000(e) at the time.

THE COURT: Well, this frequently happens as it did, you could say, in this case. That you have filed an EEOC claim but you have not received the right to sue

letter and it comes in later and the complaint is amended and that's what happened. And even when it was amended you did not mention the 103 or—that is, the retaliation claim for which you'd received a right to sue letter in April.

MR. PALNICK: I think that's probably a matter of two different lawyers filing two different complaints, Your Honor. Mr. Walker filed the original complaint and I filed the amended complaint when I received the notice of right to sue after I'd been handling the file at that point. But our position is—I have stated at the time Mr. Walker filed the original complaint he was acting under 2000(e) for retaliation, acting under the right to sue which he had received.

THE COURT: Well, you know, I have to rule as a matter of law. It occurs to the Court—and I have read the complaint carefully and the amended complaint— that I think it would fail for not having been filed in the appropriate period of time if that was—let's just say that was the sole basis, that I was not hired in retaliation. So I do believe the defendant is correct on that issue and the first time it was actually mentioned—the first time I noticed it was last night, reading the brief. It was mentioned in the brief which was filed last week.

MR. PALNICK: In the pretrial sheet, Rule 21.

THE COURT: Information sheet.

■ After the Court of Appeals remanded the case to this Court, an order was entered directing the plaintiff to give focus to her retaliation claim by filing another amendment to her complaint. On August 29, 1990, she did in fact file her "Second Amended Complaint" in which she sets forth her retaliation claims, for the first time in a formal pleading, and she again purports to seek relief under 42 U.S.C. §§ 1981, 1983 and 2000e, et seq. In the Second Amended Complaint, she refers to her EEOC retaliation charge (in Case No. 85–85–0103) and, indeed, attaches a copy thereof and also a copy of her right to sue letter. Although the Second Amended Complaint states that she received her

"right to sue" letters on both the retaliation claim and the racial discrimination charge (No. 85–85–103) in "July," she, in fact, had received her "right to sue" letter on the retaliation claim on April 19, 1985, i.e., before the original complaint was filed in this case (on June 11, 1985). In any event, the plaintiff is now attempting to assert retaliation claims under Title VII, 1981 and 1983, and the defendant has once again challenged the right of the plaintiff to proceed under any of these provisions.

So what does the Eighth Circuit Court of Appeals state about this problem?

We believe that the issues of non-hiring because of race and non-hiring in retaliation for filing the previous lawsuit, *Sherpell I*, are so intricately intertwined and involve the adducing of such similar testimony that the interests of judicial economy and the ends of justice suggest that they should have been tried together.

What are we to make of such language? If race and retaliation claims are made with regard to some employment decision then, of course, those claims should be tried together. But no one is forced to assert either claim. A person who suffers an adverse employment decision might, under such circumstances as we find here, believe that that decision was because of race or retaliation, both, or neither. Due process requires notice of the claim being litigated. Time requirements and statutes of limitations turn on such notice. A person who files an EEOC claim and receives a right to sue letter thereon is not required to pursue that claim in the courts. And a person who files two such claims, one for race and the other for retaliation, and receives right to sue letters on both is not required to file a lawsuit on both or either. A decision to litigate must be made and that decision must be apparent from the pleadings. Here the panel of the Eighth Circuit either misread the record or was misled into believing that, although the original and amended complaints herein said nothing about retaliation, the plaintiff nevertheless had "attached the 'Right to Sue' retaliation letter to" her original complaint and that should suffice. See Eighth Circuit panel opinion, p. 5. Well, yes—if the retaliation

letter was attached to the complaint, the defendant would at least be put on inquiry to clarify at that point what claim or claims the plaintiff was asserting—race or retaliation, or both. But the letter was not attached. There was no notice of any claim other than that based on alleged racial discrimination. And then, as if to reemphasize the point, when plaintiff received her race discrimination claim (No. 102) right to sue letter, she promptly filed an amendment to her complaint to show her entitlement to proceed under Title VII on that claim.

The panel of the Eighth Circuit went on to say:

> Appellee cannot claim surprise at the retaliation claim because it was a party to the Equal Employment Opportunity Commission proceedings and the Humnoke Public Schools received a copy of the "Right to Sue" notice sent to appellant on the retaliation claim.

That without more, the Court trusts, is not the law. Once again it is clear that the Court of Appeals is *assuming* that there was *some* notice of the retaliation claim to be found in this Court's pleadings. More particularly, it improperly assumed that the retaliation right to sue letter had been attached to the complaint. Note the following additional language from its opinion:

> We believe that the plaintiff's failure to plead in specific detail the retaliation charge is not fatal when viewed in the totality of the circumstances.

The words "failure to plead *in specific detail* the retaliation charge" make this obvious. Without doubt the Court assumed that plaintiff had attached her right to sue retaliation claim letter to her complaint. Otherwise, the sentence makes no sense because, without that element, there was *nothing* in the pleadings, *general or specific,* about the retaliation claim. But if one assumes the Court believed that the retaliation right to sue letter had been attached, then reliance on the "totality of the circumstances" would make sense.

Finally the Court of Appeals makes the following statement:

> In any event, the jurisdictional prerequisites of Title VII, like a statute of limitations, are subject to equitable tolling. *See Zipes, et al. v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 [102 S.Ct. 1127, 1132, 71 L.Ed.2d 234] (1982). In this case, appellee knew of the retaliation claim; much of the same evidence for the claim of racial discrimination is also applicable to the claim of retaliation and the prejudice to the appellee would have been minimal. Consequently, appellant should have been allowed to proceed on her claim of retaliation. We therefore reverse and remand to the district court with instructions to proceed in accordance with this opinion as to the claim of retaliation.

With all deference, this Court does not believe that the panel has correctly described or applied the concept of "equitable tolling."[2]

Has the Court of Appeals finally resolved the factual and legal issues discussed above or has it left it for this Court to do on remand? It appears that the latter is correct. Earlier in the opinion, when the Court of Appeals was discussing the possibility of plaintiff's proceeding under § 1981, it pointed out that this Court had not addressed the issue whether such a claim would be time barred. And then it observed:

> Since fact finding is the basic responsibility of the district courts, this critical issue should not be initially decided on appeal. *See Pullman–Standard v. Swint,* 456 U.S. 273, 291–92 [102 S.Ct. 1781, 1791–92, 72 L.Ed.2d 66 (1982)]; *DeMarco v. U.S.,* 415 U.S. 449, 450 [94 S.Ct. 1185, 1186, 39 L.Ed.2d 501] (1974).

So as this Court views the situation, it is free to direct attention to the inadvertent error of the Court of Appeals (*Cf. Patterson v. Crabb,* 904 F.2d 1179 (7th Cir., 1990) in which Judge Posner pointed out that the

---

**2.** The panel also misreads *Zipes* when it states that "the jurisdictional requirements of Title VII are subject to equitable tolling." It is precisely because the timely-filing provision of Title VII is *not* jurisdictional that the Supreme Court in *Zipes* held it was "subject to waiver as well as tolling when equity so requires." 102 S.Ct. 1127, 1135.

"law of the case" doctrine does not prevent the correction of court of appeals' prior misreading of the record.) and to determine the law and find the facts in accordance with its own lights. But if this Court is wrong in its view of the effect of the Eighth Circuit Court's opinion, i.e., if the Eighth Circuit has finally concluded that all legal roadblocks have been removed and that plaintiff is entitled to pursue her retaliation claim just as if she had timely pled that claim in her original complaint, then it would be prudent for this Court to fully tryout that factual claim regardless of its own views on the law. It is for that reason that the Court tried out such claim, relying upon the record previously made September 8, 1987—September 10, 1987, as supplemented by the evidence presented on September 17 and September 18, 1990.[3]

On remand, this Court not only faces the legal issues which were raised by the respondent before the trial which started on September 8, 1987, and were ripe at that time, but also new and additional issues arising out of this Court's findings and conclusions as set forth in its Memorandum Opinion of October 5, 1987. In that opinion, this Court found that plaintiff had only one viable complaint, to wit: that she was not rehired in late August of 1985 as a first grade teacher pursuant to the application she filed in April 1985. This Court held that she was not in a position to pursue any other claims relating to events before or after 1985. This limitation is expressly recognized by plaintiff in its pretrial brief filed August 29, 1990:

> The factual issues to be tried have been narrowed somewhat by this Court's earlier factual findings which were not disturbed by the Court of Appeals. Specifically, this Court's finding that the plaintiff did not make application for a position prior to April, 1985, nor for any years thereafter, limits the plaintiff's claim to one first grade teaching position filled in August, 1985, by Ms. Barbara Trice.

**3.** Counsel for both parties agreed before trial in a joint "Status Report" as follows:
> Accordingly, counsel have agreed that the prior testimony from the first trial shall be incorporated into this trial on the retaliation issue, thereby avoiding the need to duplicate the earlier evidence.

What is the effect of these rulings? First, the Court found that plaintiff had no viable claims based upon any employment decisions made prior to the year 1985. Therefore, plaintiff could in no event prevail upon either her 1984 race discrimination claim or upon her 1984 retaliation claim. The only claim she was permitted to pursue was based upon the failure of the defendant district to rehire her in late August 1985 pursuant to the application she filed in April of 1985. This lawsuit was filed on June 11, 1985 before the elementary school vacancy at issue had even occurred. It was probably in July 1985 that Ms. Morris advised Mr. Weaver that she would not be returning to teach in the fall of 1985. So, the action, or inaction, of which plaintiff complains occurred after this lawsuit was filed and during the pendency thereof. The plaintiff did not file a claim of either race discrimination or retaliation with the EEOC after August 1985.

## II. DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE TITLE VII RETALIATION CLAIM.

Before the Court in this civil rights action is defendant's Motion for Partial Summary Judgment. Defendant urges the Court to dismiss the reemployment retaliation claim asserted by plaintiff under 42 U.S.C. § 2000e et seq. (Title VII). Plaintiff's response argues that these issues were disposed of in her favor in *Sherpell v. Humnoke School District,* 874 F.2d 536 (8th Cir.1989).

### A. *Legal Standard For Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter

of law." The United States Supreme Court has said that Rule 56(c) mandates entry of summary judgment "against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court further stated in *Lujan v. National Wildlife Federation*, — U.S. —, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), that summary judgment motions "may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 3187. In the present case, the material facts are not in dispute; the issue is whether defendant should prevail as a matter of law.

### B. *The Title VII Retaliation Claim*

Defendant urges the Court to dismiss plaintiff's retaliation claim under 42 U.S.C. § 2000e because plaintiff failed to file an EEOC charge with respect to defendant's August, 1985, decision not to hire her. In the first trial this Court "found all of the facts pertinent to [plaintiff's] claims in regard to school year 1985–86 and subsequent years even though she filed no EEOC charge in connection therewith." Memorandum Opinion of October 5, 1987, at 26 (Miscellaneous Additional Finding No. 7). Thus the Court found that defendant's decision not to hire plaintiff for the 1985–86 school year was not included in plaintiff's EEOC charges. The Court of Appeals did not disturb this finding.

■ A Title VII plaintiff is not limited to the strict letter of her EEOC charge. The rule is that "[w]hen an employee seeks judicial relief for incidents not listed in [her] original [administrative] charge ..., the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the [administrative] charge, including new acts *occurring during the pendency of the charge.*" *Anderson v. Block*, 807 F.2d 145, 148 (8th Cir.1986) (quoting *Oubichon v. North Am. Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir.1973) (emphasis added)). *See also Wentz v. Maryland Cas. Co.*, 869 F.2d 1153, 1154 (8th Cir.1989). This view supports the policy that a plaintiff should not have to file a new charge for each continuing "like or reasonably related" incident of discrimination committed by the employer; such a policy would only create needless procedural barriers. *Anderson*, 807 F.2d at 148. This post-charge window for later, related events closes, however, at the termination of administrative proceedings on the charges. *Id.*

The *Anderson* Court apparently struck a balance between procedural barriers to the plaintiff and fairness to the defendant:

> [W]hile the length of time during which a plaintiff may bring suit based on post-charge conduct will be limited only by the promptness with which administrative proceedings on the initial charges are concluded, we see no unfairness in thus preserving the right to a judicial determination throughout the period during which the postcharge incident could be subject to administrative investigation and resolution.

*Id.*

■ In the case at bar, plaintiff filed the EEOC charges for race discrimination and retaliation in October, 1984. The right to sue letters were received on April 19, 1985 (retaliation) and July 19, 1985 (race discrimination), and the EEOC's administrative proceedings terminated on those dates, respectively, for each charge. Even if it could be argued that the defendant's decision in August, 1985, not to hire plaintiff for the 1985–86 school year is arguably "like or reasonably related" to the retaliation charges, the *Anderson* rule states that the administrative charge can only be deemed to apply to actions which occurred while the EEOC proceeding was pending. Because defendant's decision not to hire plaintiff occurred after the EEOC proceedings terminated, plaintiff's reliance on Title VII as grounds for the 1985–86 school year retaliation claim is misplaced. Further, as we have already seen, plaintiff did not apply for employment with defendant prior to

the 1985–86 school year and thus did not make a prima facie case for race discrimination. Memorandum Opinion of October 5, 1987, at 8–9. This is true for the retaliation claim as well. There could be no "adverse employment action" by defendant until plaintiff applied for a job. *See Sherpell,* 874 F.2d at 540.

The Court of Appeals has in effect held that the timely filing prerequisites of Title VII are subject to equitable tolling. That Court also stated that defendant knew of the retaliation claim, much of the same evidence applied to both claims and the prejudice to defendant would be minimal. *Sherpell,* 874 F.2d at 540. In *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984), the United States Supreme Court rejected the argument that equitable tolling should apply merely because the defendant had not demonstrated prejudice from the pro se plaintiff's failure to observe pleading formalities. The *Baldwin* Court stated that "[a]lthough absence of prejudice is a factor to be considered in determining whether the doctrine of equitable tolling should apply once a factor that might justify such tolling is identified, it is not an independent basis for invoking the doctrine and sanctioning deviations from established procedures." *Id.* at 152, 104 S.Ct. at 1726. The Court further stated that "[i]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Id.* (quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 2497, 65 L.Ed.2d 532 (1980)). *See also Hill v. John Chezik Imports,* 869 F.2d 1122, 1124 (8th Cir.1989) ("Courts have generally reserved the remedy of equitable tolling for circumstances which were truly beyond the control of the plaintiff").

In the case at bar, this Court is convinced that equitable tolling is not appropriate. Plaintiff received her right to sue letter for the retaliation charge two months before the complaint was filed. She was represented by highly qualified and experienced civil rights counsel from the onset, but she nevertheless failed to include the retaliation claim in her original complaint or in her amended complaint. Moreover, plaintiff never indicated in any pleading short of the pretrial conference information sheet that a retaliation claim was being raised.

The present case is distinguishable from equitable tolling fact patterns such as affirmative defendant misconduct, inadequate notice to plaintiff, pending appointment of counsel motion or court misinformation to plaintiff. *See Baldwin,* 466 U.S. at 151, 104 S.Ct. at 1725 (citations omitted). *See also Warren v. Department of the Army,* 867 F.2d 1156 (8th Cir.1989) (equitable tolling appropriate where limitations period expired while magistrate was considering plaintiff's pending motions for appointment of counsel and in forma pauperis status). "One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." *Baldwin,* 466 U.S. at 151, 104 S.Ct. at 1725. The message in *Baldwin* is clearly "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." *Id.* at 152, 104 S.Ct. at 1726. *See also James v. United States Postal Service,* 835 F.2d 1265, 1267 (8th Cir.1988) (equitable tolling inappropriate when plaintiff's only explanation for noncompliance was that "he was unassisted by counsel, unable to find a lawyer, and unfamiliar with the legal process. Those circumstances do not justify equitable modification of the requirements.").

## III. MERITS OF PLAINTIFF'S RETALIATION CASE.

The facts previously found by this Court in its Memorandum Opinion of October 5, 1987, must be accepted as the starting point of this analysis. Those findings are fixed and provide part of the background and the context within which to assess the merits of plaintiff's retaliation claim. They also set forth important credibility findings. And the evidentiary record which the Court must consider consists of all of the testimony and exhibits received at the trial of the race discrimination claim held on

September 8, 9 and 10, 1987, which bear upon, and are relevant to, the retaliation claim, together with the supplementary evidence received at the trial on September 17 and 18, 1990. But, first, what are plaintiff's factual allegations concerning retaliation?

In her Second Amended Complaint filed after remand on August 29, 1990, plaintiff alleges:

4. In February, 1984, Brenda Sherpell, along with other black members of the Allport, Arkansas community filed suit against the Humnoke School District and its superintendent, Ed. Weaver, and other agents of the district, alleging that the School District violated the constitutional rights of their children to a desegregated school system and an otherwise effective education. *Sherpell v. Humnoke School District No. 5,* 619 F.Supp. 670 (E.D.Ark. 1985). (Sherpell I). Among the issues which they raised were governance of the School District (alleging maintenance of an illegal at-large voting scheme for school board members); discriminatory student discipline policies and practices; discriminatory faculty selection practices; and a fully racial environment.

*        *        *        *        *        *

6. On October 24, 1984, plaintiff filed two charges with the EEOC ... Charge No. 85–85–103 alleges retaliation for failure to rehire plaintiff because of her participation in protected activity, i.e., filing *Sherpell I.*

7. An elementary teaching position became vacant at the end of the 1984–85 school term.

8. On April 16, 1985, plaintiff sent a resume to the School District requesting reemployment with the Humnoke Public Schools. On April 24, 1985, a completed application form was sent to the Superintendent.

9. Defendant did not interview plaintiff for the position even though her application was on file the entire summer prior to the 1985–86 school year. Ultimately, defendant interviewed and hired the only other applicant, Ms. Barbara Trice, for the position.

10. The defendant's failure to interview and hire plaintiff was the result of the district's retaliatory animus toward Ms. Sherpell for filing a lawsuit against the district for racially discriminatory practices, i.e., *Sherpell v. Humnoke I.*

The plaintiff attached to her Second Amended Complaint a copy of her "retaliation" charge of discrimination. The particulars set forth therein are:

I. From 1977–80 I was employed by Respondent as a Teacher, but I resigned my position because of personal reasons. In February 1984 I filed a law suit against Respondent. On or about April 30, 1984 I sought re-employment but was denied.

II. The reason given by Edsel Weaver (White) Superintendent, for not rehiring me was there were no vacancies.

III. I believe that I am being retaliated against for having opposed practices made unlawful under Title VII inasmuch as:

a. When I resigned my position, I was told that whenever I wanted to return I would be rehired.

b. Since my resignation, I have filed in court a law suit against Respondent opposing practices protected under Title VII.

c. On or about April 30, 1984 Respondent had three vacancies for Grades 1, 3 and Kindergarten.

d. I was denied placement into the above mentioned vacancies, and I was qualified for the same.

That charge was filed on October 29, 1984 in reference to an alleged adverse employment decision(s) made "on or about April, 1984." The retaliation claim in the Second Amended Complaint, filed August 29, 1990, relates to an alleged adverse employment decision made in late August 1985, some ten months after this lawsuit was filed and approximately one and a half years after the first action (*Sherpell I*) was filed (February 1984).

The portions of this Court's October 5, 1987 opinion which it believes do relate, or might relate, directly or by way of back-

ground, to plaintiff's retaliation claim are as follows:

"The Court ... accepts Judge Howard's findings insofar as they might be relevant to the issues in this case upon the principle of collateral estoppel. The issue in this case, however, is much narrower and much more specific than the many broad issues with which Judge Howard is dealing.

"The plaintiff, Brenda Sherpell, taught elementary remedial math in the Humnoke School District from September 1978 to December 1980. The defendant is a very small rural school district having a professional teaching staff of some 20 people covering the 13 grades, kindergarten through twelfth grade. It is a poor district, continually having financial and budgetary problems. The School Board has five positions. The superintendent is Mr. Ed Weaver. He has served in that capacity for the last nine years. Before that, he served the district as Coach and Social Studies teacher. Ms. Sherpell is black and Mr. Weaver is white. They both agree that they had a very good relationship while she taught in the district. The plaintiff's husband, Mr. Clyde Sherpell, lost an arm in an accident in September of 1980. Ms. Sherpell continued teaching until December 1980 but then asked Mr. Weaver if he and the Board would grant her a leave of absence so that she could stay home and take care of her husband. Mr. Weaver readily agreed. There appears to have been further discussions in early 1981 between Mr. Weaver and Ms. Sherpell during which Ms. Sherpell indicated that she wished to be granted a leave for the entire 1981–82 school year but would like to be offered the opportunity to resume teaching for 1982–83 school year. The matter was discussed with the Board and they approved the requested leave on April 14, 1981. (See exhibit 15 in Minutes of the Board Meetings.) On that same date, a written 'Leave of Absence' agreement was entered into by Ms. Sherpell and the Board, Mr. Roy Isbell, president, and Mr. Thomas Jones, secretary, signing for the Board. The agreement provides, inter alia, that 'at the conclusion of this agreement, said teacher will be offered a contract for the 1982–83 school year.'

"Mr. Weaver testified that Ms. Sherpell later verbally 'resigned' her position as a remedial math teacher. Ms. Sherpell denies that she resigned. This is really not a critical issue of fact as the Court sees it, but both parties have made much of it as a matter of credibility. And the Court agrees it does bear on credibility controversies between the plaintiff and Mr. Weaver. The Court credits Mr. Weaver's testimony in regard to this issue. As will be pointed out below, a very good relationship existed between Ms. Sherpell and Mr. Weaver at least up into the year 1984. There was no antagonism or adversarial relationship between them. The minutes of the Board Meeting of June 18, 1981, which were approved in writing on July 23, 1981, and which were made essentially contemporaneously with the event state:

Mr. Weaver informed the Board that Brenda Sherpell verbally resigned her position as remedial teacher. Because of a cut-back in federal funds, the Board voted to accept Brenda Sherpell's resignation and to eliminate the remedial math program thus not filling the vacancy.

See plaintiff's exhibit 15. Furthermore, in plaintiff's proffered exhibit 1, being an EEOC 'Retaliation' claim (which the Court received *only* with respect to its bearing upon this *race discrimination claim*), the plaintiff stated that she was employed at the district until 1980 but 'I resigned my position' for personal reasons. In that EEOC claim form she also states 'When I resigned my position I was told that whenever I wanted to return I would be hired.' The Court accepts, and finds, that the plaintiff did verbally resign as testified to by Mr. Weaver. However, the evidence persuades the Court that the plaintiff was not told that, as stated in the EEOC claim, 'whenever I wanted to return I would be hired.' On the contrary, the Court finds the agreement to be that which is stated in the written 'Leave of Absence' agreement.

"Both Ms. Sherpell and Mr. Weaver have difficulty in identifying the number and

dates of their conversations between 1981 and the beginning of the 1982–83 school term. But sometime prior to the 1982–83 school year, Mr. Weaver inquired of Ms. Sherpell as to her intentions with respect to the 1982–83 school year, and she advised him that she was enjoying staying at home and being a housekeeper and a mother and was not interested in working in the district. Again it must be pointed out that, at that time at least, there was a friendly relationship between these two people.

"The Court further finds that Mr. Weaver advised the Board that he had offered the plaintiff a contract for the 1982–83 school year but that she stated that she did not want it but, rather she wanted to stay home with her children. This is confirmed by the testimony of Mr. Leroy Isbell, president of the School Board. The Court finds and concludes that this ended any formal legal relationship between the plaintiff and the defendant school district. She had been offered a contract for the 1982–83 school term 'at the conclusion of' the leave of absence agreement in accordance with its terms and had turned it down.

"It is plaintiff's position that she consistently sought reemployment with the defendant school district after the 1981–82 school year, and that she regularly, both in the spring and in August of each year, inquired about employment opportunities for the then coming school year. Mr. Weaver and the defendants deny this and contend that Ms. Sherpell made no application—not even an oral application or inquiry—for any position until her written application of April 16, 1985. See plaintiff's exhibit 4. The Court notes that Ms. Sherpell, in her EEOC 'retaliation' claim (see plaintiff's proffered exhibit 1), stated that she had been employed by the defendant school district from 1977 until 1980 when she resigned. She then states 'on or about April 30, 1984, I sought reemployment but was denied.' It is also interesting to note that in her EEOC charge of discrimination on the basis of race (see plaintiff's exhibit 5), she also states that she sought reemployment on or about April 30, 1984. There is no suggestion in either claim that she sought employment with the defendant district at any time from the date she left the district in 1980 until April 30, 1984. Both of the EEOC charges were made by the plaintiff on October 24, 1984.

"The question arises: when did the plaintiff first apply for employment with the district after the end of the 1982–83 school term? If she applied on or about April 30, 1984, as indicated in the EEOC claim forms, that application would, of course, be for the 1984–85 school year. On the basis of the evidence, the Court finds that the plaintiff did not, either in writing or orally, apply for any position with the district before her written letter of April 16, 1985. In her testimony, plaintiff herself acknowledged that she never, from 1982 until 1985, let members of the school board know that she was interested in being employed by the district. But she did claim that she made phone calls to Mr. Weaver seeking employment regularly every year in the months of April and August from 1982 until 1985. The Court, as noted, does not credit that testimony. The Court also finds that the defendant school district had in effect a formal written application procedure since 1984 which it required applicants to follow. Plaintiff's exhibit 15 reflects the written forms developed to implement this procedure. Oral applications for professional teaching positions were not permitted. And the district did not search through old applications and contact such persons in an attempt to determine if any were still interested. On the contrary, the Board and Mr. Weaver placed the initiative upon interested persons to express that interest by applying in writing to fill posted and advertised positions.

"It is true that the plaintiff's husband, Mr. Clyde Sherpell, had a conversation with Mr. Weaver around February 20, 1984. This was when the plant that was employing Mr. Sherpell was closing down. That conversation was recalled vividly by Mr. Weaver because in it, Mr. Clyde Sherpell practically demanded that the district hire him as an industrial arts teacher and that the district also provide him with two assistants. He also told Mr. Weaver that 'I also expect $20,000 a year.' Mr. Weaver,

whose memory is not too good, did remember the date of February 20, 1984, as the date of this conversation because it was the Monday before the Friday upon which the Sherpells and others filed a lawsuit against the district primarily on behalf of the black children attending the defendant district. When he was leaving, Mr. Sherpell apparently also asked Mr. Weaver, 'Why don't you hire my wife?' Such a question might have been asked, but it would certainly not serve as an application by Ms. Sherpell for any position. And, as has been pointed out, Ms. Sherpell herself did not even claim that she made even an oral application until April 1984. Nor did plaintiff make any complaint about the defendant district's failures to reemploy her in the lawsuit she filed against the defendant district on February 25, 1984. And the instant suit was not filed until June 11, 1985. The Court also does not credit Mr. Sherpell's testimony that he talked to Mr. Weaver in April of 1983 about reemploying his wife. The conferences between Mr. Sherpell and Mr. Weaver during the 1983–84 period dealt with disciplinary problems affecting the Sherpell's children.

"Mr. Nathan Bryant, the brother of the plaintiff, testified that in October or November 1984, he met with Mr. Weaver and members of the Board after the conclusion of a Board meeting and discussed the then pending case against the district, trying to get some relief for Mr. Sherpell's children and other children having problems. Mr. Bryant testified that then Mr. Sherpell brought up the question whether there was any possibility of Mr. Sherpell's wife going back to work. He testified that the Board members looked at each other but said nothing and that Mr. Weaver also said nothing. He stated that they did not say one way or another.

"Mr. Bryant testified that he also had a conversation with Mr. Weaver, apparently in 1986, in which he suggested that, before new applications be sought to fill any positions that might become vacant, old applications and resumes be reviewed. He stated that Mr. Weaver objected to using applications from previous years, stating that he did not think it would be appropriate and that it would cause problems.

"The Court does not credit the testimony of Mr. Bryant concerning the possibility of his sister's going back to work for the district. Even if such an inquiry had been made, which the Court does not credit, it would not substitute for plaintiff's personally applying for some specific vacancy as required by the defendant district's consistent policy and practice. Additionally, it is plaintiff's position that one of these conversations occurred in the spring of 1986.

(Footnote 3): Plaintiff's Proposed Finding of Fact No. 12 states, inter alia: Joe Bryant, the brother of Brenda Sherpell ... stated that he had several conferences with Weaver regarding Sherpell's reemployment ... in the spring of 1986. Weaver told Bryant that it would be in everyone's best interest for the Sherpells to just leave town and stay.

This is probably correct although contrary to Mr. Bryant's original testimony. However, by the time of this conversation, Ms. Sherpell had already moved to Atlanta, Georgia and this was known to Mr. Weaver. Finally, a conversation in the spring of 1986 would have no bearing on issues related to employment for the 1985–86 school year.

"The plaintiff suggests that at least by the date defendants became aware of her EEOC charge (plaintiff's exhibit 5), they should have known she was seeking reemployment. They further suggest that the EEOC 'Charge of Discrimination' should be considered an application. The trouble is that it is not an application for employment. It is a charge that Ms. Sherpell was discriminated against by reason of her race because the defendant school district did not rehire her for the 1984–85 school year. Specifically, she noted her resignation in 1980 and then stated, 'On or about April 30, 1984, I sought reemployment but was denied.' She states that the reason given was 'there was no vacancies available for the 1984–85 school year.' She states that 'since I sought employment, Respondent has hired three teachers, all white for grades 1, 3 and kindergarten. I am quali-

fied for the above positions.' This EEOC charge is dated October 24, 1984. It is a specific charge of discrimination for employment decisions allegedly made after April 30, 1984, and before the commencement of the 1984–85 school year in August 1984.

"The Court has already found that plaintiff did not apply, either formally or informally, for any teaching position with the defendant district before her April 16, 1985, letter application. So it is not necessary to review the vacancies for the 1984–85 school year. (The Court does note, however, that plaintiff was not qualified to teach at the kindergarten level and that a qualified person applied for that vacant position that year and was hired.)

"On April 16, 1985, the plaintiff submitted an application and resume for employment, stating in her letter, 'I hope to hear from you soon.' She obviously had in mind employment for the school year 1985–86 because the hiring period for that school year would generally be from April until July or August. Indeed, in answer to the question, 'When could you begin work here?', she replied, 'Beginning 1985–86 school term.' Her resume stated her job objective as follows: 'To work in a professional setting as an elementary teacher or media specialist.' It is noted that she did not apply for kindergarten teacher, a position for which she was not qualified. Neither the testimony nor the exhibits reveal the existence of any 'media specialist' position in the defendant district. So, plaintiff was applying for an 'elementary teacher' position, i.e., for a position for which she was qualified and certified. There was one such position that became vacant and which was filled in the school year 1985–86. That was the first grade teacher position. Ms. Susan Morris had left the position at the end of the 1984–85 term. Ms. Barbara Trice was selected to fill the position for the year 1985–86 and she actually served in that position until sometime during the 1986–87 school term when she resigned. (She was replaced by Ms. McDonald for the balance of that school year. The Court discredits Mr. Bryant's testimony that, knowing of Ms. Trice's resignation, he sought her replacement by his sister, Ms. Sherpell. Furthermore, it appears that Ms. Sherpell was still in Georgia when Ms. Trice resigned and Ms. Sherpell never applied to fill that vacancy.)

"Ms. Trice, who is black, applied specifically for the first grade position. According to plaintiff's exhibit 12 she was born in 1948 and had nine years of teaching experience with certifications in Elementary Education and Reading. She was recommended by all of her references. She was rated 'Excellent' or 'Above Average' in all categories as a result of her interview. The note, photocopied on the applicant's screening form, states: 'Ms. Trice is one of the black teachers we selected. Came across in the interview. Superior to all other candidates for the position.' The evidence does not disclose what other candidates were considered.

"In the spring of 1986, Ms. Sherpell moved to Georgia to open a cleaning business with her sister. Apparently, Mr. Sherpell and the children joined her there in April 1986. Mr. Sherpell sought and received permission for his children to complete that school year by correspondence because it was too late to enroll in the Atlanta, Georgia schools. See plaintiff's exhibit 22. The Sherpells apparently stayed in Georgia until the beginning of 1987. Of course, Mr. Weaver knew of this move. He signed the agreement, plaintiff's exhibit 22. He believed that the Sherpells had moved to Georgia. He had no reason to believe Ms. Sherpell was applying for any vacant position with the district for the school year 1986–87. Indeed, Ms. Sherpell was living in Georgia until the middle of that school year.

"The plaintiff, Ms. Sherpell, applied and was accepted for employment in the Altheimer School District for the current 1987–88 school year. This requires her to commute some 25 miles between her home and her job each day. She did not make application for any position with the defendant school district for the current school year. The Court rejects the idea that the pendency of this lawsuit should be considered, in effect, a continuing application

for any vacancy that might occur in the district for which plaintiff might be qualified. The Complaint, filed June 11, 1985, focused on events prior to that time. It was never amended to include any claims based upon any application for employment filed by plaintiff subsequent to June 11, 1985. This may be because the plaintiff did not, in fact, submit any applications, as required, after that date.

"The Court, again, finds that the plaintiff made no application for any vacancies at any time before 1985. She was therefore not considered for any vacant position prior to 1985 by Mr. Weaver or the Board. And the plaintiff made no application for any vacant position or positions at any time after 1985.

"The plaintiff has only an 'elementary' certification. She was only qualified to teach in grades 1–6. She does not have the proper certification to teach in kindergarten nor in special education. And this clearly was the honest understanding of both the Board and Mr. Weaver.

"The school district has certain policies and practices concerning the hiring of the teaching faculty. Admittedly it may follow somewhat different procedures in the selection of coaches, principals and administrative staff. Teacher recruitment and selection are the responsibility of the superintendent. All professional personnel must be approved by the superintendent and recommended to the Board. It is, and has been, the practice of the superintendent to recommend to the Board only one candidate for any particular teaching vacancy. It appears that only on one occasion, when Mr. Weaver was not satisfied with any of three applicants, did he present the names of more than one applicant to the Board. The Board agreed with him that none were qualified. Within a week thereafter a qualified applicant, in Mr. Weaver's judgment, applied and he then recommended her to the Board which accepted her. But his usual and standard practice was to submit only the name of the person he recommended for the vacancy.

"As with so many small districts, the Board here selected a superintendent and essentially turned over the operation of the school to him. They looked to him to carry out the policies established by the Board. The Board placed the responsibility on the superintendent to see to it that persons nominated for employment met all of the qualifications established by law or by the Board. The Board members understood and expected Mr. Weaver to recommend for teaching vacancies the applicant best qualified for the position. Although the Board has the power to reject anyone nominated by the superintendent, this Board has consistently followed his recommendations with respect to teaching personnel. As indicated above, the Board may become more personally involved in the selection of a coach, a principal, or some other administrative personnel.

\*     \*     \*

"[T]he Court notes that plaintiff made a prima facie case—and even this is admittedly arguable—only with respect to the 1985–86 school year for which she applied in writing in April 1985.

"When plaintiff was asked by her attorney why she felt her 'non-rehire' was racially motivated, she responded, in effect, 'I think the Board was racially motivated because of the mere fact that I filed an earlier suit.' She was referring to the lawsuit she, her husband, and several other parents filed on February 24, 1984, which case has been tried, and is still pending, before Judge Howard. And Mr. Sherpell testified that when he inquired of Mr. Weaver about the employment of his wife in 1985, Mr. Weaver stated that there were budgetary problems, no vacancies, and that it was also 'complicated to hire her because of the lawsuit.' (Referring to the suit filed in February 1984 by the Sherpells and others). The Court notes this testimony without crediting it. In passing, it is noted that this Court did not permit any retaliation claim because it was not raised in the Complaint or in the Amended Complaint. (It also appears that no such claim was asserted within 90 days after plaintiff received a right to sue letter in reference to the retaliation claim.)

"The Court is satisfied from all of the evidence that no employment decision complained of by plaintiff in this case which was made or omitted by the defendant school district, its Board of Directors or Mr. Weaver was based, in any way, upon race. As pointed out before, the plaintiff had been hired by the district as an elementary school remedial math teacher from 1978 until December 1980, at which point she was granted a leave of absence at her own request. Both her own testimony and that of Mr. Weaver indicate that the relationship between these two was friendly and good. It is, of course, entirely probable that the defendant school board members and Mr. Weaver were not pleased with the first lawsuit that was filed by plaintiff, her husband and others, against the district in February 1984.

"The only employment school year for which Mr. Weaver knew that the plaintiff had applied for an elementary teaching position was the 1985–86 year.

"In her 'Applicant Screening' form, Ms. Sherpell advised that she could come for an interview. However, under the 'Interview' section it appears that she was not interviewed. The only comment in that section states 'moved to Atlanta, Georgia.' It thus appears that Ms. Sherpell was out of the state or, at least, Ms. Henderson and/or Mr. Weaver thought that she was. Ms. Sherpell's own testimony does not indicate that she actually moved to Atlanta until the spring of 1986. As previously indicated, it appears that the only vacancy for which Ms. Sherpell was qualified for the school year 1985–86 was that of first grade teacher which position was awarded to Barbara Trice who is also black. The mere fact that the defendants hired a black for this position does not foreclose a charge by the plaintiff that she was denied the position on the basis of racial consideration. Nevertheless, on the basis of all of the evidence, the Court finds and concludes that the defendants' failure to hire Ms. Sherpell for the 1985–86 school year was in no way based upon race. Ms. Trice's 'Applicant Screening' form shows that she was interviewed. This interview must have occurred after August 19, 1985, the date of her application. It appears that the defendants did accept applications starting in about April but did not conduct interviews until August, when it could be assumed that all of the applications were in for the then coming school year. The implication, from the record, is that there was an attempt to contact Ms. Sherpell about an interview but that she was unavailable. The evidence is not entirely satisfactory in this regard, however. When Mr. Weaver was asked why he did not interview the plaintiff, he replied that 'we try to interview as many applicants as possible.' But he also commented that he felt that Ms. Trice was a 'better candidate that the plaintiff.' He also testified that Ms. Sherpell was out of the state. That appears to be corroborated by the notation on Ms. Sherpell's 'Applicant Screening' form, plaintiff's exhibit 12. Assuming without deciding that Ms. Sherpell was not contacted for an interview because of some animus against her—a proposition not supported by the evidence—there is nothing to indicate that such animus in any way was based upon racial considerations. Mr. Weaver's articulated basis is that he simply did not believe that Ms. Sherpell was interested in pursuing her application and that she was not available for the interview. The Court does not find this explanation to be pretext.

(Footnote 4:) Mr. Weaver appeared at times to be intimidated and confused under interrogation by plaintiff's attorney. And, as noted, his memory is not good. He knows he selected Ms. Trice for the vacancy and he does not appear to be completely sure why plaintiff was not interviewed. He believes she was out of state and unavailable. The Court has credited his explanation while recognizing that it is not a model of coherence or consistency. But the Court must take the witnesses as they are. * * *

"The members of the school board learned of Ms. Sherpell's April 1985 application but they in good faith assumed that Mr. Weaver had handled the matter according to their policies and that he had recommended to them the person best qualified

among all qualified applicants for all vacant positions. Ms. Sherpell was never referred to or recommended to the board for its consideration. The board members were never called upon to knowingly make any employment decision adverse to the interests of Ms. Sherpell.

> (Footnote 5): This is apparently acknowledged by plaintiff. See her proposed finding of fact wherein, after noting that plaintiff applied in April 1985, then states, 'The District, however, has never taken any action, nor has Mr. Weaver made any recommendation for employment for Sherpell.'

They employed Ms. Trice upon Mr. Weaver's recommendation, assuming that he and Mr. Henderson had screened the applicants and found her to be the best qualified.

*Miscellaneous Additional Findings:*

"1. The Court has read and examined the Policy Statement of the defendant district. Plaintiff's exhibit 14. It particularly notes sections G–23, –24, –25, –37, –44 and –48. Apparently these policies were adopted in July of 1983 as reflected by the minutes of the Board. In any event they were in effect in and after 1985. There was a good faith attempt to follow those policies having anything to do with the issues in this case.

\* \* \*

"5. Ms. Sherpell worked as a bookkeeper for the city of Allport from around March or April of 1982 until July 1982. She attended the University of Arkansas at Little Rock (UALR) at night starting in January 1984. She received her Masters Degree in Library Science in May 1986.

\* \* \*

"7. The defendant contends that the only issues to be tried in this cause are those in relation to EEOC Charge No. 085–85–0102, in which plaintiff claimed to have been discriminated against on the basis of her race by defendant's failure to hire her for the school year 1984–85. Of course, plaintiff has completely failed to prevail on this claim. However, she also asserts claims under sections 1983 and 1981. The Court has therefore also found all of the

facts pertinent to her claims in regard to school year 1985–86 and subsequent years even though she filed no EEOC charge in connection therewith.

"8. The failure of the defendant to consider the plaintiff as an applicant for any position after the 1985–86 school year was not in any way based upon race. No prior applications made by whites or blacks were considered. The district simply had, and followed, a formal written application, interview, and hiring procedure. In fact those more formal procedures were adopted as a result of the February 24, 1984, federal lawsuit. Those procedures were applied in a racially neutral fashion.

"9. The members of the board of the defendant school district believed that their hiring and employment practices were being monitored by, and were subject to the approval of, the federal court from the time of the trial before Judge Howard in March–April of 1985 until his decision on September 30, 1985."

The defendant asserts that the above findings effectively foreclose plaintiff's retaliation claims under Title VII, Section 1981 and Section 1983. Nevertheless, the Court addresses the merits.

The Court must deal with the mind-sets, motives, and actions of (1) the five members of the school board and (2) the Superintendent, Mr. Weaver.

After reviewing the transcript of the testimony and exhibits in the 1987 trial, together with the evidence received at the hearing on September 17–18, 1990, the Court finds and concludes as follows:

The Court is convinced that the members of the school board, by the summer of 1985, in good faith believed that the district had established hiring and other employment policies and procedures in keeping with the law and the Constitution and they believed Mr. Weaver was following those policies. They placed upon Mr. Weaver the duty of providing notice of vacancies, identifying and evaluating applicants, and then recommending the one person best-qualified to fill each teaching position.

█ So, nothing in the most recent hearing has changed the Court's view as to the role of the Board in the handling of this employment decision. Although there may have been a few exceptions, the usual procedure of the Board in handling the hiring of certified teaching personnel was as set out in the Court's 1987 findings (quoted above but repeated here):

The school district has certain policies and practices concerning the hiring of the teaching faculty. Admittedly it may follow somewhat different procedures in the selection of coaches, principals and administrative staff. Teacher recruitment and selection are the responsibility of the superintendent. All professional personnel must be approved by the superintendent and recommended to the Board. It is, and has been, the practice of the superintendent to recommend to the Board only one candidate for any particular teaching vacancy. It appears that only on one occasion, when Mr. Weaver was not satisfied with any of three applicants, did he present the names of more than one applicant to the Board. The Board agreed with him that none were qualified. Within a week thereafter a qualified applicant, in Mr. Weaver's judgment, applied and he then recommended her to the Board which accepted her. But his usual and standard practice was to submit only the name of the person he recommended for the vacancy.

As with so many small districts, the Board here selected a superintendent and essentially turned over the operation of the school to him. They looked to him to carry out the policies established by the Board. The Board placed the responsibility on the superintendent to see to it that persons nominated for employment met all of the qualifications established by law or by the Board. The board members understood and expected Mr. Weaver to recommend for teaching vacancies the applicant best qualified for the position. Although the Board has the power to reject anyone nominated by the superintendent, this Board has consistently followed his recommendations

with respect to teaching personnel. As indicated above, the Board may become more personally involved in the selection of a coach, a principal, or some other administrative personnel.

\* \* \*

The members of the school board learned of Ms. Sherpell's April 1985 application but they in good faith assumed that Mr. Weaver had handled the matter according to their policies and that he had recommended to them the person best qualified among all qualified applicants for all vacant positions. Ms. Sherpell was never referred to or recommended to the board for its consideration. The board members were never called upon to knowingly make any employment decision adverse to the interests of Ms. Sherpell.

(Footnote 5): This is apparently acknowledged by plaintiff. See her proposed finding of fact wherein, after noting that plaintiff applied in April 1985, then states, "The District, however, has never taken any action, nor has Mr. Weaver made any recommendation for employment for Sherpell."

They employed Ms. Trice upon Mr. Weaver's recommendation, assuming that he and Mr. Henderson had screened the applicants and found her to be the best qualified.

*Miscellaneous Additional Findings:*

1. The Court has read and examined the Policy Statement of the defendant district. Plaintiff's exhibit 14. It particularly notes sections G–23, –24, –25, –37, –44 and –48. Apparently these policies were adopted in July of 1983 as reflected by the minutes of the Board. In any event they were in effect in and after 1985. There was a good faith attempt to follow those policies having anything to do with the issues in this case.

\* \* \*

8. \* \* \* The district simply had, and followed, a formal written application, interview, and hiring procedure. In fact those more formal procedures were adopted as a result of the February 24,

1984, federal lawsuit. Those procedures were applied in a racially neutral fashion.

9. The members of the board of the defendant school district believed that their hiring and employment practices were being monitored by, and were subject to the approval of, the federal court from the time of the trial before Judge Howard in March–April of 1985 until his decision on September 30, 1985.

To put it otherwise, the Board was sincerely trying "to do it right" in the summer of 1985. To repeat, the Board had by this time established nondiscriminatory employment policies and practices and it expected Mr. Weaver to follow same. Nothing in the evidence suggests that the Board was even aware at the time it approved Mr. Weaver's recommendation to hire Ms. Trice, that Ms. Sherpell was in competition with Ms. Trice for the same first grade position. Some of the members of the Board were aware that Ms. Sherpell had applied for reemployment back in April of 1985. But none were aware that she was still interested and, in fact, seeking this particular elementary school position when they routinely approved Mr. Weaver's recommendation of Ms. Trice as the best qualified candidate. The Board members honestly believed that Mr. Weaver had followed their policies and that he had exercised his best judgment in deciding to recommend Ms. Trice. The members of the Board, in following Mr. Weaver's recommendation that the district hire Ms. Trice, did not knowingly take any action adverse to plaintiff's interest. In hiring Ms. Trice, they simply had no awareness that they were rejecting Ms. Sherpell. The Board and the individual members thereof did not hire Ms. Trice (or fail to consider or not hire Ms. Sherpell) in retaliation for Ms. Sherpell's participation in *Sherpell I*, for her having filed EEOC charges, or for any other reason.

The Court has reviewed the earlier testimony of Board members: Mr. Tommy Camp (T463–516); Mr. Elbert Carter (T 157–813), and Mr. Leroy Isbell (T 184–194) together with its notes on the testimony of Mr. Isbell, Mr. Camp and Mr. Harry Loftis, taken during the September 17–18, 1990 trial. The Court credits their testimony as to the Board's policies, their knowledge and their motives and intentions in relation to Ms. Sherpell's claims. And the Court discredits the testimony of Mr. Sherpell and Mr. Bryant as it relates to Ms. Sherpell's claim to the extent that it contradicts the testimony of the Board members. These findings and conclusions are consistent with, and similar to, findings made by the Court in its Memorandum Opinion of October 5, 1987. See above. Those earlier findings are reaffirmed. And, of course, the evidence would not justify any finding or conclusion that the Board, or any of its members, were negligent or recklessly indifferent in regard to plaintiff's application for employment. One member testified he was "indifferent," but it is clear he meant "not personally involved." The Board members left it to Mr. Weaver to evaluate and recommend teacher-applicants. And they were not on notice that the plaintiff was in any way being unfairly treated. Under the circumstances, they had no reason or obligation to investigate or to look behind Mr. Weaver's recommendation decision.

█ This brings us to a consideration of the mind-set, motives and actions of Mr. Weaver as they relate to Ms. Sherpell's retaliation claim. Some of this Court's findings, as contained in its opinion of October 5, 1987, touch on the possibility of a retaliatory motive on Mr. Weaver's part. Although quoted above, they are repeated here as follows:

When plaintiff was asked by her attorney why she felt her "non-rehire" was racially motivated, she responded, in effect, "I think the Board was racially motivated because of the mere fact that I filed an earlier suit." She was referring to the lawsuit she, her husband, and several other parents filed on February 24, 1984, which case has been tried, and is still pending, before Judge Howard. And Mr. Sherpell testified that when he inquired of Mr. Weaver about the employment of his wife in 1985, Mr. Weaver stated that there were budgetary problems, no vacancies, and that it was also

"complicated to hire her because of the lawsuit." (Referring to the suit filed in February 1984 by the Sherpells and others). The Court notes this testimony without crediting it. In passing, it is noted that this Court did not permit any retaliation claim because it was not raised in the Complaint or in the Amended Complaint. (It also appears that no such claim was asserted within 90 days after plaintiff received a right to sue letter in reference to the retaliation claim.)

The Court is satisfied from all of the evidence that no employment decision complained of by plaintiff in this case which was made or omitted by the defendant school district, its Board of Directors or Mr. Weaver was based, in any way, upon race. As pointed out before, the plaintiff had been hired by the district as an elementary school remedial math teacher from 1978 until December 1980, at which point she was granted a leave of absence at her own request. Both her own testimony and that of Mr. Weaver indicate that the relationship between these two was friendly and good. It is, of course, entirely probable that the defendant school board members and Mr. Weaver were not pleased with the first lawsuit that was filed by plaintiff, her husband and others, against the district in February 1984.

The only employment school year for which Mr. Weaver knew that the plaintiff had applied for an elementary teaching position was the 1985–86 year.

In her "Applicant Screening" form, Ms. Sherpell advised that she could come for an interview. However, under the "Interview" section it appears that she was not interviewed. The only comment in that section states "moved to Atlanta, Georgia." It thus appears that Ms. Sherpell was out of the state or, at least, Ms. Henderson and/or Mr. Weaver thought that she was. Ms. Sherpell's own testimony does not indicate that she actually moved to Atlanta until the spring of 1986.

As previously indicated, it appears that the only vacancy for which Ms. Sherpell was qualified for the school year 1985–86 was that of first grade teacher which position was awarded to Barbara Trice who is also black. The mere fact that the defendants hired a black for this position does not foreclose a charge by the plaintiff that she was denied the position on the basis of racial consideration. Nevertheless, on the basis of all of the evidence, the Court finds and concludes that the defendants' failure to hire Ms. Sherpell for the 1985–86 school year was in no way based upon race. Ms. Trice's "Applicant Screening" form shows that she was interviewed. This interview must have occurred after August 19, 1985, the date of her application. It appears that the defendants did accept applications starting in about April but did not conduct interviews until August, when it could be assumed that all of the applications were in for the then coming school year. The implication, from the record, is that there was an attempt to contact Ms. Sherpell about an interview but that she was unavailable. The evidence is not entirely satisfactory in this regard, however. When Mr. Weaver was asked why he did not interview the plaintiff, he replied that "we try to interview as many applicants as possible." But he also commented that he felt that Ms. Trice was a "better candidate that the plaintiff." He also testified that Ms. Sherpell was out of the state. That appears to be corroborated by the notation on Ms. Sherpell's "Applicant Screening" form, plaintiff's exhibit 12. Assuming without deciding that Ms. Sherpell was not contacted for an interview because of some animus against her—a proposition not supported by the evidence—there is nothing to indicate that such animus in any way was based upon racial considerations. Mr. Weaver's articulated basis is that he simply did not believe that Ms. Sherpell was interested in pursuing her application and that she was not available for the interview. The Court does not find this explanation to be pre-text.

(Footnote 4:) Mr. Weaver appeared at times to be intimidated and confused

under interrogation by plaintiff's attorney. And, as noted, his memory is not good. He knows he selected Ms. Trice for the vacancy and he does not appear to be completely sure why plaintiff was not interviewed. He believes she was out of state and unavailable. The Court has credited his explanation while recognizing that it is not a model of coherence or consistency. But the Court must take the witnesses as they are. * * *

Mr. Weaver was also called to testify at the hearing conducted on September 17–18, 1990. Once again, the Court noted his poor memory and apparent confusion. It will also be recalled that just before the first trial back in 1987, the plaintiff settled with Mr. Weaver and the case against him was dismissed. And it now appears that, after the first trial, the Humnoke School District and Mr. Weaver came to a parting of the ways by mutual agreement but under acrimonious circumstances. According to Mr. Weaver, the district "bought his contract out" and he left the district around October 1, 1988. (He is presently the Superintendent at the Holly Grove school district.) The plaintiff's attorney suggested, but did not prove, that his departure was caused by his using school property for his personal benefit and permitting (or making) telephone calls to a "900" number dealing in pornographic messages. Mr. Weaver denied these suggestions and stated that his departure was a "negotiated thing" arising out of a "difference in philosophy" after a School Board election resulted in a change in Board membership. So much for developments relating to Mr. Weaver and his status since the 1987 trial.

It will be recalled that when the plaintiff, Ms. Sherpell, applied for an elementary teaching position in April of 1985, there was no such vacancy. The critical vacancy occurred upon the resignation of the first grade teacher, Ms. Susan Morris, in late July 1985. Ms. Morris had worked during the 1984–85 school year. That school year ended on June 4, 1985. It appears from the School Board minutes that on May 16, 1985, the Board, upon Mr. Weaver's recommendation, renewed "all current teachers not submitting resignations." The minutes of that meeting show that only two teachers submitted resignations, Ms. Hollis and Ms. Gillette. It therefore appears that Ms. Morris' then "current" employment was continued by the Board action. Nevertheless, in July, she resigned and thereby created the vacancy that is at issue in this case. At the August 5, 1985 Board meeting, Mr. Weaver was authorized to advertise "the current teacher vacancies in the local newspapers." He believes he did advertise the position and that Ms. Trice saw the advertisement in the Stuttgart paper. Ms. Barbara Trice applied for the first grade position on August 19, 1985. The Board authorized Mr. Weaver to hire her on August 23, 1985, and she was probably hired on the next day, August 24, "to start as soon as possible but no later than Tuesday, September 3rd, 1985."

Mr. Weaver was asked why he would advertise and seek other applications if he knew he already had an applicant who was qualified to fill the first grade vacancy. It will be recalled that the plaintiff, Ms. Sherpell, had applied in April. So, when Ms. Morris resigned in late July 1985, the plaintiff's application would assumedly still have been on file. So plaintiff's question: why advertise?

By August of 1985 the defendant school district had been through the trial before Judge Howard (LR–C–84–191) and the parties were awaiting Judge Howard's opinion (which was actually entered on September 30, 1985). It is clear that the pendency of the case before Judge Howard and the trial of that case brought home to Mr. Weaver and the Board members the necessity of following professional personnel practices, among which was the need to advertise vacancies. Indeed, in one instance back in April of 1985, the Board advertised vacancies that it had already made tentative commitments to fill.[4] Mr. Weaver further testified that the district's affirmative action

---

**4.** This involved the hiring of Mr. and Mrs. Phillips which will be discussed later. See Miscellaneous Finding A, below.

commitment required the advertising of such openings. In any event, the result was that Ms. Trice became an applicant for the position.

The question here is whether a retaliatory animus affected or prejudiced the manner in which Mr. Weaver handled the task of selecting the successor to fill Ms. Morris' position. To the Court, this is a very close question.

Why did not Mr. Weaver call in Ms. Sherpell for an interview? After all, he interviewed Ms. Trice. But Mr. Weaver responds that it was not necessary to interview Ms. Sherpell. He knew her very well as a previously employed teacher in the district. But, of course, that had been several years before. So, one would want to know what she had been doing since leaving her employment with the defendant district. Of course, Mr. Weaver kept up with the Sherpells because they had children in the system. And he had Ms. Sherpell's resume, submitted in April 1985, which indicated that she was a candidate for the MLIS degree at UALR and that she had served as a bookkeeper for the city of Allport in 1981 and 1982. Under "Education" in her application, Ms. Sherpell noted that she had begun her graduate study at UALR in 1984 but she did not list the time spent nor the semester hours of credit achieved.

As pointed out by the Court in its 1987 opinion, the "Applicant's Screening" page for Ms. Sherpell had the words "moved to Atlanta, Georgia" typed under the heading "Comments." Mr. Weaver suggests that a secretary, Ms. Becky Ball, may have made that entry. It was incorrect since Ms. Sherpell did not actually move to Atlanta until 1986. But there is nothing to indicate that the entry was made in bad faith or it was not believed to be true when made.

Mr. Weaver takes several somewhat inconsistent positions in his testimony in 1987 and in his testimony in 1990 concerning the handling of this selection process. He does not now remember if he ever considered Ms. Sherpell's application. He states that "things moved fast" after Ms. Morris' resignation and that it was important that he hire someone to teach in her stead very quickly. On the one hand, Mr. Weaver states that he believed that Ms. Sherpell was no longer interested and simply did not consider her as an active applicant for the position and, on the other hand, he states that he hired Ms. Trice because she was the best qualified applicant. The record does not reveal whether there were other applicants for the position in addition to Ms. Sherpell and Ms. Trice. But it is clear that the plaintiff did not reapply or contact Mr. Weaver after the vacancy was advertised.

While it is absolutely clear that race had nothing to do with Mr. Weaver's actions in connection with Ms. Sherpell's application, it is not clear that retaliation did not play some role in the matter. Certainly Mr. Weaver was not pleased that Ms. Sherpell had played an active part in the major litigation against the district and that she had also filed EEOC claims. He felt she was harrassing the district. Also, Mr. Weaver testified that the superintendent at the England school district, where Ms. Sherpell had taught from 1974 to 1978 had advised him that, although he did not want to get involved, he would say that she had been terminated by that district.[5] Ms. Sherpell testified that this was not true and the Court credits her testimony that she was not involuntarily terminated.

So, there is evidence from which the Court could find that Mr. Weaver did not process Ms. Sherpell's application fairly out of some retaliatory animus. But there is also evidence from which the Court could conclude that Mr. Weaver reasonably believed that Ms. Sherpell was no longer, in August of 1985, still pursuing her application for some elementary position in the district. The position was advertised in early August. Ms. Sherpell did not reapply after the advertisement nor take any steps

---

**5.** This would tend to indicate that he did some checking on the references in the plaintiff's application. Of course, Ms. Sherpell had worked for the defendant school district after leaving her job with the England School district. Mr. Weaver did not say when he conversed with the superintendent about the plaintiff.

to show her continued interest in the position. And it was not the policy of the defendant or Mr. Weaver to look back over earlier filed applications whenever a vacancy occurred. Furthermore, Ms. Ball or someone had noted on the "Applicant's Screening" form for Ms. Sherpell that she had "moved to Atlanta, Georgia." Reviewing all the testimony, both in 1987 (when recollections would have been fresher) and in 1990, the Court is not convinced by a preponderance of the evidence that Mr. Weaver handled the plaintiff's application in a discriminatory manner out of a retaliatory motive. This is one of those instances where the Court is left with the impression: "Maybe yes, maybe no." The ultimate burden is upon the plaintiff to prove that such a retaliatory motive was at least a motivating factor in the decisions made by Mr. Weaver in connection with her application. Since the plaintiff has failed to carry her burden in this respect, her claim that Mr. Weaver acted out of a retaliatory motive, as alleged, must fail.

## IV. MISCELLANEOUS FINDINGS.

A. The plaintiff has pointed to the manner in which Mr. Weaver handled the filling of three vacancies in the spring of 1985. The three vacancies were for the positions of a science teacher, an agriculture teacher, and a vocal and instrumental music teacher. Mr. Weaver testified, and the Court finds, that these were unusually difficult positions for the defendant district to fill.

On April 4, 1985, Judge Howard entered an order in LR–C–84–191 restraining the district from hiring any new employees to fill vacancies or newly created positions until the court had entered its judgment in that case. Prior to Judge Howard's order, Mr. Weaver had made tentative verbal offers of these jobs to two black and one white applicants. These verbal offers were made before the individuals had actually made their written applications. Ms. Debbie Phillips was offered a position as a science teacher. Although others had applied, she was the best qualified and was the only applicant certified in chemistry, biology and science. Mr. James Phillips was offered the position of agriculture

teacher, a position for which he was certified. Both Mr. and Mrs. Phillips are black. Ms. Terry Black, a white, applied for the position of vocal and instrumental music teacher. She was the only applicant certified in vocal and instrumental music and was felt to be the best qualified. All three advised Mr. Weaver that they had to make their employment decisions quickly because other potential employers had requested decisions from them. Mr. and Mrs. Phillips filed written applications on April 26, 1985 (See plaintiff's Exhibit 7.) These positions, along with two other positions, were advertised in the newspaper. Such advertisements, found in Plaintiff's Exhibit 12, were published on April 23, 24 and 29, 1985.

On May 16, 1985, the defendant school district filed a "Motion for Reconsideration of Order" advising Judge Howard of the above situation. It stated that by that date, the district had conducted a thorough application procedure for these three positions and was prepared to demonstrate that Mr. and Mrs. Phillips and Ms. Black were the best qualified for those positions. Accordingly, the defendants requested relief from the court's order of April 7, 1985, so they could fill those positions. Immediate relief was requested so the persons involved could promptly make their plans for the upcoming school year. On June 17, 1985, the court signed an order approved by the attorney for the plaintiff and the attorney for the defendants (see defendant's exhibit 3), finding that it was in the best interest of the district to employ Mr. and Mrs. Phillips and Ms. Black. The Court notes that although the district was authorized to hire Ms. Black, she never became a teacher.

This episode shows that Mr. Weaver, in these exceptional circumstances, did initially make offers to these three individuals before going through the application and advertising process. However, before seeking approval from Judge Howard, formal applications were made and filed by these individuals and the vacancies were in fact advertised in late April 1985. By the time the motion for reconsideration was filed on May 16, 1985, the defendant dis-

trict was able to advise the court that it had conducted a "thorough application procedure for these three positions." And it does appear that other applications for such positions were made, although Mr. and Mrs. Phillips and Ms. Black were considered to be the best qualified. It will be recalled that the plaintiff also applied in April 1985, but the difference is that no vacancy then existed in any position for which she was qualified. The advertisements which appeared in the newspapers in late April also show that there was no elementary position open at the time. Again, that vacancy did not occur until late July 1985.

This instance also tends to corroborate Mr. Weaver's testimony that he believed it was necessary to advertise the vacancy after Ms. Morris resigned even though an application from a qualified candidate was already on file.

B. As it did in connection with their testimony during the 1987 trial, the Court also discredits the testimony of Mr. Joe Bryant, Jr., and Mr. Clyde Sherpell given during the hearing on September 17–18, 1990, to the extent that it contradicts the testimony of the members of the Board of the defendant school district and Mr. Weaver with respect to communications allegedly made by them and others to the Board or Mr. Weaver. And, the Court credits the testimony of Mr. Tommy Camp and Mr. Harry Loftis concerning the Board's knowledge, intent and role in the process by which Ms. Trice was selected for the vacancy.

C. The Court finds that the minutes of the Board were kept in the ordinary course of business and regularly and accurately transcribed and maintained. Those minutes, however, were not intended to reflect all of the conversations and discussions at Board meetings that did not result in any Board action. Where Board action was taken, it was duly recorded.

D. The plaintiff points out that the action of the Board on August 23, 1985, in which Mr. Weaver was authorized to hire Ms. Trice (and several others), used the term "substitute teachers." Technically,

these were not substitute positions. However, Mr. Weaver and the Board members, while awaiting Judge Howard's decision, were concerned with the "freeze" order entered by Judge Howard. They apparently decided to use the term "substitute" at their attorney's suggestion on the theory that this might avoid any problem. It must be remembered that Ms. Trice is black.

## V. CONCLUSION.

Plaintiff's retaliation claim fails both upon the facts and as a matter of law as set forth above. Her complaint must therefore be dismissed.